IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ALAINA LISOVICH, | Civil Action No. |
| *Plaintiff*, | Filed Electronically |
| vs. | |
| UPMC MAGEE-WOMENS HOSPITAL d/b/a UPMC MAGEE-WOMENS CENTER FOR FERTILITY AND REPRODUCTIVE ENDOCRINOLOGY, | |
| *Defendant*. | |

## COMPLAINT IN CIVIL ACTION

Plaintiff, Alaina Lisovich, by and through the undersigned counsel, files the following Complaint in Civil Action against Defendant, UPMC Magee-Womens Hospital d/b/a UPMC Magee-Womens Center for Fertility and Reproductive Endocrinology, averring as follows:

## THE PARTIES

1. Plaintiff, Alaina Lisovich ("Plaintiff"), is an adult individual who resides in Pittsburgh, Pennsylvania.

2. Defendant, UPMC Magee-Womens Hospital d/b/a UPMC Magee-Womens Center for Fertility and Reproductive Endocrinology ("Defendant"), is a Pennsylvania nonprofit corporation with a principal place of business located at 300 Halket Street, #610, Pittsburgh, Pennsylvania 15213 and a registered office at 300 Halket Street, #610, Pittsburgh, Pennsylvania 15213. The Plaintiff reported to work on a regular basis at Defendant's facility located at 419 Rodi Road, Pittsburgh, Pennsylvania 15235 (the "Facility").

## JURISDICTION AND VENUE

**A.  This Court Possesses Subject Matter Jurisdiction Pursuant to 28 U.S.C. § 1331 and Supplemental Jurisdiction Pursuant to 28 U.S.C. § 1367.**

3. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 ("Federal Question Jurisdiction") as Plaintiff is advancing claims under Title VII of the Civil Rights Act of 1964, as amended by the Pregnancy Discrimination Act of 1978, 42 U.S.C. § 2000e, *et seq*. ("Title VII"), and the Pregnant Workers Fairness Act, 42 U.S.C. § 2000gg, *et seq*. ("PWFA") (Plaintiff's claims arising under Title VII and the PWFA are identified as the "Federal Law Claims").

**B.  The United States District Court for the Western District of Pennsylvania is the Appropriate Venue for this Matter Pursuant to 28 U.S.C. § 1391(b).**

4. Venue is proper in the United States District Court for the Western District of Pennsylvania, Pittsburgh Division (hereinafter, the "Western District") as a substantial part of the events and omissions giving rise to the Federal Law Claims occurred within this judicial district. Therefore, venue is proper pursuant to 28 U.S.C. § 1391(b).

5. Specifically, these events and omissions occurred within Allegheny County, Pennsylvania, which is one of the counties encompassed by the Western District.

6. This matter is properly before the Pittsburgh Division of the Western District given the conduct complained of herein arose in Allegheny County, Pennsylvania, and conduct arising within Allegheny County is docketed within the Pittsburgh Division of the Western District Pursuant to LCvR 3.

**C.     This Court May Exercise Personal Jurisdiction Over Defendant.**

7.     This Court may exercise personal jurisdiction over Defendant pursuant to 42 Pa. C.S. § 5301(a)(2), and this Court's exercise of jurisdiction comports with the Due Process Clause of the United States Constitution.

8.     Personal jurisdiction is proper over a defendant if the defendant is a registered Pennsylvania entity and has thus "consented" to the exercise of general personal jurisdiction pursuant to 42 Pa. C.S. § 5301.  *Aetna Inc. v. Kurtzman Carson Consultants, LLC*, No. 18-470, 2019 BL 114021, at *5 (E.D. Pa. Mar. 29, 2019) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985); *Bane v. Netlink, Inc.*, 925 F.2d 637, 641 (3d Cir. 1991)).

9.     42 Pa. C.S. § 5301 states: "The existence of any of the following relationships between a person and this Commonwealth shall constitute a sufficient basis of jurisdiction to enable the tribunals of this Commonwealth to exercise general personal jurisdiction over such person." 42 Pa. C.S. § 5301(a). This definition is expanded to "corporations" pursuant to 42 Pa. C.S. § 5301(a)(2) which provides:

> Corporations.--
> (i) Incorporation under or qualification as a foreign corporation under the laws of this Commonwealth.
> (ii) Consent, to the extent authorized by the consent.
> (iii) The carrying on of a continuous and systematic part of its general business within this Commonwealth.

42 a. C.S. § 5301(a).

10.    As discussed above, Defendant has registered itself as a domestic nonprofit corporation in the Commonwealth of Pennsylvania and thereby subjected itself to the general jurisdiction of Pennsylvania's tribunals; further, Defendant maintains the Facility in Pennsylvania and conducts business operations within Pennsylvania. Accordingly, Defendant may properly be personally brought before this Court pursuant to 42 Pa. C.S. § 5301(a)(2).

**D.     Plaintiff Has Exhausted Her Administrative Remedies; Her Federal Law Claims are Properly Before This Court.**

11.     Plaintiff has satisfied all procedural and administrative prerequisites under 42 U.S.C. § 2000e-5 and 43 P.S. § 959 and may now proceed to bring this action before the Court. Specifically:

a. On or about September 6, 2025, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission (the "EEOC") seeking redress for the Federal Law Claims at charge number 533-2025-03301 (the "EEOC Charge").

b. On September 10, 2025, the EEOC issued the Notice of Right to Sue ("RTS Notice"), affording Plaintiff 90 days within which to timely file the Federal Law Claims. See **Exhibit A**, a true and correct copy of the RTS Notice.

c. The instant complaint is filed within the 90-day time period.

## FACTUAL BACKGROUND

12.     Plaintiff, Alaina Lisovich ("Plaintiff"), commenced her employment with Defendant on or about November 18, 2024, in the position of "Registered Nurse" ("RN").

13.     Plaintiff worked full-time at Defendant's facility located at 419 Rodi Road, Pittsburgh, PA 15235 (the "Facility"), earning a salary of approximately $65,520 per year.

14.     Plaintiff's responsibilities included, but were not limited to, answering patient messages, responding to patient phone calls, reviewing and triaging physicians' orders, scheduling appointments, ordering medications, and coordinating diagnostic testing.

15.     At the time of Plaintiff's hiring, members of Defendant's hiring team commented on the number of nurses currently on maternity leave and expressed that they were glad Plaintiff

4

was joining because the Facility was severely understaffed, evincing a preexisting discriminatory animus toward pregnant employees.

16. On March 15, 2025, Plaintiff learned that she was pregnant.

17. On March 16, 2025, Plaintiff informed her colleague, Certified Nurse Midwife Stephanie Fitting ("CNM Fitting"), of her pregnancy. CNM Fitting, acting within her scope as a medical professional, recommended Plaintiff receive bloodwork.

18. In reliance on this medical guidance and after confirming with her supervisor, Jamie Dimetrosky ("Dimetrosky"), that it was permissible, Plaintiff entered the lab order for herself, consistent with her understanding of Facility practice.

19. Shortly thereafter, Plaintiff's manager, Kelly Flaherty ("Flaherty"), confronted Plaintiff and demanded a written statement explaining her actions.

20. Flaherty asserted that Plaintiff was not authorized to place such an order for herself, despite this policy never having been clearly communicated to Plaintiff nor consistently enforced with other employees.

21. Plaintiff apologized for any misunderstanding and assured Flaherty it would not happen again.

22. Following the disclosure of her pregnancy, Plaintiff was subjected to disparate treatment. Supervisor Dimetrosky was known to permit employees to leave early when they felt unwell.

23. However, when Dimetrosky became aware that Plaintiff's symptoms of nausea, vomiting, cramping, and fatigue were related to her pregnancy, this same flexibility was withheld, and Plaintiff was forced to continue working while ill.

24. On April 3, 2025, Plaintiff experienced pregnancy-related cramping and bleeding while at work. A physician colleague, Dr. Breonna Slocum ("Dr. Slocum"), overheard Plaintiff's concerns and, on her own initiative, offered to perform a brief ultrasound to provide medical reassurance.

25. The ultrasound lasted approximately five to seven minutes. Plaintiff did not solicit the ultrasound but accepted her colleague's unsolicited medical assistance due to her concerning symptoms.

26. On April 14, 2025, Defendant's management questioned Plaintiff about the ultrasound and claimed she had violated a policy communicated in an April 2, 2025 email which warned that undergoing an ultrasound could result in termination.

27. Plaintiff stated truthfully that she had never seen, read, or been made aware of this email or its contents prior to the meeting. The first time she saw the purported warning was when management showed her a screenshot during this meeting.

28. Plaintiff explained that the email was likely part of a long, unread message thread and that accessing the thread may have been misinterpreted as reading the specific message. The email was not flagged for importance, and no one from management had ever followed up to ensure she had read or acknowledged its contents.

29. The April 2, 2025 email also allegedly contained a mandatory HIPAA recertification form, yet Defendant's management never mentioned this or followed up with Plaintiff about its completion, further demonstrating the pretextual nature of their reliance on this email.

30. Despite the fact that Dr. Slocum, a physician, initiated and performed the ultrasound, she was not disciplined and remains employed by Defendant.

31. Furthermore, another non-pregnant employee, Sydney Rusnack, received both bloodwork and an ultrasound for infertility-related concerns at the Facility without any disciplinary action.

32. Defendant's policies were selectively enforced to target Plaintiff only after she became pregnant.

33. On April 23, 2025, Defendant suspended Plaintiff without pay pending an investigation into her alleged misconduct.

34. On May 1, 2025, approximately six weeks after she disclosed her pregnancy, Defendant terminated Plaintiff's employment, citing "dishonesty" related to the April 2 email as the reason for her discharge.

35. Defendant's stated reason for terminating Plaintiff is a pretext for pregnancy discrimination and retaliation.

36. Following her unlawful termination, Defendant opposed Plaintiff's application for unemployment compensation benefits, compounding the financial harm she suffered.

37. Since her unlawful termination, Plaintiff has been unable to secure new employment despite diligent efforts, and as a result, has suffered and continues to suffer significant economic and emotional damages.

### COUNT I
### PREGNANCY DISCRIMINATION AND RETALIATION
### IN VIOLATION OF TITLE VII
### (42 U.S.C. § 20003, et seq.)

38. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth at length herein.

39. Title VII of the Civil Rights Act of 1964, as amended by the Pregnancy Discrimination Act of 1978 ("Title VII"), makes it unlawful for an employer to discriminate

against an individual with respect to her compensation, terms, conditions, or privileges of employment, because of such individual's sex. 42 U.S.C. § 2000e-2(a)(1).

40. Under Title VII, discrimination "on the basis of sex" includes discrimination "because of or on the basis of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k).

41. Title VII also prohibits employers from retaliating against an employee for opposing any practice made unlawful by these statutes.

42. To establish a prima facie case of pregnancy discrimination, a plaintiff must show that: (1) she is a member of a protected class; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances of the adverse action give rise to an inference of discrimination.

**A.     Plaintiff is a Member of a Protected Class.**

43. As averred hereinabove, Plaintiff was pregnant during her employment with Defendant.

44. As a pregnant employee, Plaintiff is a member of a protected class under Title VII.

**B.     Plaintiff Was Qualified to Perform the Essential Duties of Her Job.**

45. At all times material hereto, Plaintiff was qualified to perform the essential duties of her position as a Registered Nurse.

46. Plaintiff possessed the requisite skill, experience, and education for her role and performed her job duties in a satisfactory manner without any disciplinary issues prior to disclosing her pregnancy to Defendant.

C.    **Plaintiff Suffered Adverse Employment Actions.**

47.    An "adverse employment action" is an action that is "serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." Storey v. Burns Int'l Sec. Servs., 390 F.3d 760, 765 (3d Cir. 2004).

48.    Shortly after Defendant became aware of Plaintiff's pregnancy, it subjected her to a series of escalating adverse employment actions, including but not limited to:

   a. Subjecting her to heightened scrutiny and unwarranted discipline for seeking medically necessary care related to her pregnancy;

   b. Denying her scheduling flexibility that was routinely afforded to non-pregnant employees;

   c. Suspending her employment without pay on or about April 23, 2025; and

   d. Terminating her employment on or about May 1, 2025.

49.    Subsequent to her termination, Defendant took further adverse action against Plaintiff by opposing her application for unemployment compensation benefits.

D.    **The Circumstances of the Adverse Actions Give Rise to an Inference of Unlawful Discrimination and Retaliation.**

50.    The adverse actions taken against Plaintiff occurred under circumstances that give rise to a strong inference of unlawful pregnancy discrimination and retaliation.

51.    The temporal proximity between Defendant's learning of Plaintiff's pregnancy and the commencement of the adverse actions is unusually suggestive of discriminatory animus. Defendant began its pattern of heightened scrutiny and disparate treatment almost immediately after Plaintiff disclosed her pregnancy, and it terminated her employment a mere six weeks later.

52.    Defendant treated Plaintiff more harshly than similarly situated, non-pregnant employees. Specifically:

9

    a. Dr. Breonna Slocum, the physician who initiated and performed the ultrasound on Plaintiff, was not subjected to any known discipline and remains employed by Defendant.

    b. Another non-pregnant employee, Sydney Rusnack, received both bloodwork and an ultrasound for medical reasons at the Facility without any disciplinary repercussions.

    c. Supervisor Jamie Dimetrosky routinely allowed non-pregnant employees to go home when feeling unwell but denied this same flexibility to Plaintiff once aware her symptoms were pregnancy-related.

53. The discriminatory animus is further evidenced by comments made by Defendant's hiring team, who expressed frustration with other nurses being on maternity leave, demonstrating a preexisting bias against pregnant employees.

54. Defendant's proffered reason for Plaintiff's termination alleged "dishonesty" regarding her failure to read an email dated April 2, 2025 is a pretext for unlawful discrimination.

55. Plaintiff never saw or read the email in question prior to being confronted by management. The email was unflagged, embedded in a longer message thread, and never followed up on by management, despite its now-claimed importance.

56. Defendant's decision to terminate a highly qualified nurse with an unblemished record for a single, disputed, and minor alleged infraction, without any form of progressive discipline, defies logic and demonstrates that the stated reason was not the true reason for her discharge.

57. Defendant's actions were taken to eliminate a pregnant employee that it viewed as a staffing burden and to avoid accommodating her pregnancy, medical needs, and future maternity leave.

58. Furthermore, Defendant retaliated against Plaintiff for engaging in protected activity, namely, seeking medically necessary care and requesting minor accommodations for her pregnancy-related medical conditions. The ultimate adverse action of termination was a direct result of this protected activity.

E. **Defendant's Conduct was Malicious and Reckless, Entitling Plaintiff to Punitive Damages.**

59. A plaintiff may recover punitive damages by demonstrating that a defendant "engaged in discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1).

60. "Malice" and "reckless indifference" pertain to an employer's knowledge that it may be acting in violation of federal law. *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 535 (1999).

61. At all relevant times, Defendant, a sophisticated healthcare provider specializing in women's health and fertility, knew or should have known that discriminating against an employee because of her pregnancy is unlawful.

62. Defendant acted with malice or, at a minimum, reckless indifference to Plaintiff's federally protected rights by selectively enforcing policies, creating a pretextual reason for her termination, and punishing her for being pregnant in a workplace that professes to champion women's health.

63. As a direct and proximate result of Defendant's discriminatory and retaliatory conduct in violation of Title VII, Plaintiff has suffered tangible economic losses, including lost

back pay and benefits and lost front pay and benefits, as well as substantial non-economic damages in the form of emotional distress, embarrassment, humiliation, and pain and suffering.

WHEREFORE, Plaintiff, Alaina Lisovich, demands judgment against Defendant, UPMC Magee-Womens Hospital d/b/a UPMC Magee-Womens Center for Fertility and Reproductive Endocrinology, for its willful violations of Title VII and seeks: (i) compensatory damages, including but not limited to past and future pecuniary and non-pecuniary losses, including emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life; (ii) punitive damages in an amount sufficient to punish Defendant and deter it from engaging in similar conduct in the future; (iii) equitable relief in the form of back pay and front pay; (iv) the costs of this action and reasonable attorney's fees; (v) pre-judgment and post-judgment interest; and (vi) such other and further legal and equitable relief as this Court deems just and proper.

## COUNT II
## FAILURE TO ACCOMMODATE IN VIOLATION OF THE
## PREGNANT WORKERS FAIRNESS ACT (PWFA)
## (42 U.S.C. § 2000gg, et seq.)

64. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth at length herein.

65. The Pregnant Workers Fairness Act ("PWFA") makes it an unlawful employment practice for a covered employer to fail to make reasonable accommodations to the known limitations related to the pregnancy, childbirth, or related medical conditions of a qualified employee, unless the employer can demonstrate that the accommodation would impose an undue hardship on the operation of the business. 42 U.S.C. § 2000gg-1(1).

66. The PWFA further makes it unlawful for an employer to take adverse action in terms, conditions, or privileges of employment against a qualified employee on account of the employee requesting or using a reasonable accommodation. 42 U.S.C. § 2000gg-1(4).

67. An employer also violates the PWFA by failing to engage in the interactive process with a qualified employee who has communicated a known limitation.

A. **Plaintiff Had a Known Limitation Related to Her Pregnancy.**

68. As averred hereinabove, Plaintiff became pregnant during her employment, and Defendant was made aware of her pregnancy on or about March 16, 2025.

69. As a result of her pregnancy, Plaintiff experienced physical limitations, including but not limited to nausea, vomiting, cramping, fatigue, and bleeding.

70. Defendant, through its managers and supervisors including Kelly Flaherty and Jamie Dimetrosky, had actual knowledge of Plaintiff's pregnancy and the related physical symptoms she was experiencing.

71. These symptoms, and the need for associated medical monitoring such as bloodwork and ultrasounds to ensure a viable pregnancy, constituted "known limitations related to the pregnancy" under the PWFA.

B. **Defendant Failed to Provide a Reasonable Accommodation and Failed to Engage in the Interactive Process.**

72. At all times relevant hereto, Defendant had an affirmative duty to provide a reasonable accommodation for Plaintiff's known limitations and to engage in a good faith interactive process to identify an appropriate accommodation.

73. Reasonable accommodations for Plaintiff's limitations could have included, but were not limited to, providing scheduling flexibility, permitting her to leave work when experiencing severe symptoms, and allowing her to obtain medically necessary monitoring like the bloodwork and ultrasound without penalty.

74. Defendant failed to provide any reasonable accommodation. To the contrary, once Defendant was aware Plaintiff's symptoms were pregnancy-related, it withheld the same

scheduling flexibility and support that supervisor Jamie Dimetrosky routinely afforded to non-pregnant employees who were feeling unwell.

75. Instead of engaging in an interactive process to discuss accommodations for Plaintiff's concerning symptoms, Defendant responded with heightened scrutiny, disciplinary questioning, a formal investigation, suspension, and ultimately, termination.

76. At no point did Defendant engage in a good faith dialogue with Plaintiff to explore or identify potential accommodations for her pregnancy-related limitations.

**C.     Defendant Unlawfully Penalized Plaintiff for Her Need for an Accommodation.**

77. Defendant not only failed to accommodate Plaintiff but also took direct adverse action against her for actions necessitated by her pregnancy-related medical condition, which constituted requests for or use of an accommodation.

78. Plaintiff's act of obtaining medically necessary bloodwork at the direction of a medical professional, and her acceptance of a medically advisable ultrasound offered by a physician due to concerning pregnancy symptoms, were acts taken to address her known limitations.

79. Defendant unlawfully penalized Plaintiff for these actions by:

   a. Demanding a written explanation for obtaining medically necessary bloodwork;

   b. Subjecting her to a formal investigation regarding the brief, physician-initiated ultrasound;

   c. Suspending her without pay on April 23, 2025; and

   d. Terminating her employment on May 1, 2025, using the ultrasound incident as a pretext.

80. These actions constitute a direct violation of the PWFA's prohibition against penalizing an employee for requesting or using a reasonable accommodation.

**D.    Providing an Accommodation Would Not Have Imposed an Undue Hardship.**

81. The accommodations Plaintiff needed were de minimis and would not have imposed an undue hardship on Defendant's business operations.

82. Allowing Plaintiff to obtain a 5-7 minute ultrasound performed by a colleague during work hours, or allowing her to leave early when experiencing severe pregnancy-related illness, would have imposed no significant difficulty or expense on Defendant.

83. This is particularly true given that Defendant is a large and sophisticated healthcare provider specializing in women's health, fertility, and reproductive endocrinology.

84. Defendant's refusal to provide these simple accommodations, and its decision to instead punish Plaintiff, was not based on any undue hardship but was instead motivated by discriminatory animus toward her pregnancy.

85. As a direct and proximate result of Defendant's failure to accommodate Plaintiff and its unlawful penalization of her in violation of the PWFA, Plaintiff suffered adverse employment actions, including the loss of her job, which has caused her to suffer significant economic losses, including lost back pay and front pay, as well as non-economic damages including emotional distress, embarrassment, and humiliation.

86. Defendant's conduct was undertaken with malice or, at a minimum, with reckless indifference to Plaintiff's federally protected rights under the PWFA, thereby entitling Plaintiff to an award of punitive damages.

WHEREFORE, Plaintiff, Alaina Lisovich, demands judgment against Defendant, UPMC Magee-Womens Hospital d/b/a UPMC Magee-Womens Center for Fertility and

Reproductive Endocrinology, for its willful violations of the PWFA and seeks: (i) compensatory damages, including but not limited to past and future pecuniary and non-pecuniary losses, including emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life; (ii) punitive damages in an amount sufficient to punish Defendant and deter it from engaging in similar conduct in the future; (iii) equitable relief in the form of back pay and front pay; (iv) the costs of this action and reasonable attorney's fees; (v) pre-judgment and post-judgment interest; and (vi) such other and further legal and equitable relief as this Court deems just and proper.

## JURY DEMAND

87. Plaintiff, Alaina Lisovich, requests a trial by jury on all matters so triable.

Date: December 9, 2025

                                      Respectfully submitted,

                                      **THE WORKERS' RIGHTS LAW GROUP, LLP**

By:    */s/ Brendan K. Petrick*
        Brendan K. Petrick, Esq. (Pa. I.D. No. 88968)
        */s/ Patrick W. Carothers*
        Patrick W. Carothers, Esq. (Pa. I.D. No. 85721)
        */s/ Garret A. Hampton*
        Garret A. Hampton, Esq. (Pa. I.D. No. 338635)

        The Workers' Rights Law Group, LLP
        Foster Plaza 10
        680 Andersen Drive, Suite 230
        Pittsburgh, PA 15220
        Telephone: 412.910.9592
        Facsimile: 412.910.7510
        brendan@workersrightslawgroup.com
        patrick@workersrightslawgroup.com
        garret@workersrightslawgroup.com

        *Counsel for Plaintiff, Alaina Lisovich*